UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE, | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | |
| THE PENNSYLVANIA STATE UNIVERSITY | : | |
| | : | |
| *Defendants* | : | |

## **COMPLAINT**

Plaintiff, John Doe[1], a 3rd-year Penn State Electrical Engineering student, files this civil rights lawsuit seeking to invalidate a two-semester disciplinary suspension based upon a Title IX Hearing Panel's finding that he violated the University's Code of Conduct's sexual misconduct policy.  This finding was the product of a deeply flawed, unconstitutional disciplinary process that deprived Doe of the most basic due process protections, including the rights to: call witnesses on his own behalf;  confront and cross examine his accuser and adverse witnesses; a fair, unbiased and unconflicted tribunal comprised of individuals who are separate and apart from, and not under, the auspices of the University's Office of Student

---

[1]  Contemporaneously with the filing of this Complaint, Plaintiff is filing a Motion for Permission to Proceed Under Pseudonym, seeking permission of the Court to proceed anonymously given the extremely sensitive and private nature of the matters alleged herein. Plaintiff refers to the female complainant in the underlying student disciplinary proceeding as "Jane Roe". As more fully set forth in the Motion, the University is fully aware of the actual identities of John Doe and Jane Roe and will not be prejudiced in any way by John Doe's use of those pseudonyms for public filings.

Conduct "prosecutor"; the presumption of innocence; the active and meaningful participation of his attorney "advisor", including their right to cross examine adverse witnesses; the equal opportunity to review and respond to evidence; an objective evaluation of all relevant evidence including exculpatory evidence; equal access to review all the evidence that the school investigator has collected, including the investigative report, and; an equal opportunity to respond to that evidence before a determination is made. John Doe filed this lawsuit because Penn State's Investigative Model denied him his right to due process and deprives him of his right to an education, his Penn State degree, sullies his reputation, jeopardizes his future livelihood, and has caused him significant emotional distress.

## PARTIES

1.      Plaintiff John Doe is an undergraduate student majoring in Electrical Engineering at the Penn State University. At the time of the alleged incident, Mr. Doe was a 19-year-old sophomore at the Penn State Altoona campus.

2.      Defendant The Pennsylvania State University ("Penn State") is an educational institution established and operated by the Commonwealth of Pennsylvania with a principal place of business at 201 Old Main, University Park, Pennsylvania. Penn State's Title IX and Office of Student Conduct are located at the University Park campus. Penn State operated under color of state law at all times relevant to this complaint.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over Plaintiff's claims arising under the United States Constitution and 42 U.S.C. §§ 1983 and 1988 pursuant to 28 U.S.C. §§ 1331 and 1343.

4.     This Court has authority to issue the declaratory and injunctive relief sought in this matter pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Federal Rules of Civil Procedure 57 and 65.

5.     This Court has venue for this claim pursuant to 28 U.S.C. § 1391. The defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim, including the disciplinary hearing and appeal, occurred in this district.

## FACTS[2]

### A.     **Penn State Adopts and Pilots an "Investigative Model"**

6.     On April 4, 2011, the U.S. Department of Education's Office for Civil Rights disseminated a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "Dear Colleague Letter"), including Penn State, that received federal funding. The Dear Colleague Letter provides a necessary set of background facts to this current action.[3]

---

[2] All of the exhibits referenced in this Complaint are being filed under seal due to their contents.
[3] See Exhibit A.

7. The Dear Colleague Letter advised that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve sexual misconduct complaints. The Dear Colleague Letter required schools to adopt a "preponderance of the evidence standard" in sexual misconduct cases. The Dear Colleague Letter stated that schools should "minimize the burden on the complainant," and encouraged universities to focus more on victim advocacy rather than due process concerns.

8. After the Dear Colleague Letter was published, many schools, including Penn State, revised their sexual assault and sexual harassment policies and procedures to ensure compliance with Title IX, under a threat of rescission of federal funding.[4]

9. On July 2, 2014, less than two months after taking office, Penn State University President Eric Barron announced the formation of a Task Force on Sexual Assault and Sexual Harassment and charged it with making recommendations that would allow the University to "become the benchmark by which other universities are judged when it comes to sexual misconduct prevention and response."[5]

---

[4] In July 2014, Catherine Lhamon, former Assistant Secretary of ED, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at http://www.msnbc.com/msnbc/campus-sexual-assault-conference-dartmouth-college).

[5] Exhibit B, Task Force on Sexual Assault and Sexual Harassment Report, January 23, 2015, p.1; http://www.psu.edu/ur/2014/Task_Force_final_report.pdf, hereafter, the "Report."

10.     In its January 23, 2015, final report, the Task Force acknowledged that

the context for its recommendation included:

> A growing national debate about higher education's response to the
> problem of sexual and relationship violence. The White House and
> Congressional leaders, spurred by student activists on college and
> university campuses, convened various groups to discuss the issue.
> Multiple federal guidelines were published. National higher education
> organizations sponsored related conversations across the country. The
> nation's news media increasingly focused their attention to the conflicts
> inherent in the problem. And the Department of Education continued to
> add new schools to its list of those colleges and universities under
> investigation for Title IX concerns—a sum that numbered eighty-six by
> early November, many of them among the most notable higher
> education institutions in the country, including Penn State.

11.     Less than a month later, President Barron adopted each of the Task

Force's 18 recommendations, including its recommendation that "the student

conduct process at each campus move away from the traditional hearing process and

embrace instead an investigative model for resolving sexual misconduct cases."

12.     This "Investigative Model" relied upon the use of an investigator, rather

than an adversarial process before a neutral hearing board, to conduct the required

fact finding in Title IX cases.

13.     Prior to the inception of the Investigative Model, disciplinary

proceedings addressing sexual misconduct claims provided the accused with the

right to a hearing where the parties and witnesses testified in-person before a fact-

finder and were subject to cross-examination.

14.     Prior to the inception of the Investigative Model, Penn State's disciplinary proceedings addressing sexual misconduct claims afforded the accused the same types of protections that students accused of other acts of misconduct, most far less serious, were afforded.

15.     Although the initial Investigative Model provided for paperless "hearings" only, the University revised and reissued their Title IX procedures twice in 2016.  On information and belief, John Doe was investigated under the November 3, 2016, revision of the Code of Conduct ("the Code"[6]) and Office of Sexual Misconduct Prevention & Response's Student Title IX Report Procedures at www.titleix.psu.edu.  On information and believe, the Student Title IX Report Procedures in place at the time John Doe was investigated is similar to the procedures currently in place.

**B.     Penn State's Code's "Special Protocols for Title IX Allegations"**

16.     Penn State's Office of Student Conduct ("OSC") is responsible for administering the University's discipline system and promulgated the Code of Conduct to outline the "standard procedures and practices of the University discipline process".   The Code created "[s]pecial procedures . . . (Section V, D) for cases involving Title IX violations."[7]

---

[6] Exhibit C.
[7] *Id*. at pg. 2.

17.     OSC refers all cases involving sexual misconduct allegations to the University's Office of Sexual Misconduct Prevention and Response ("OSMPR") which is responsible for "investigating allegations of Title IX violations."  The OSMPR will "typically investigate such allegations" using an investigator designated by the Title IX Coordinator who will attempt to gather whatever relevant information may be reasonably available regarding the alleged incident.[8] This may include interviewing the Complainant, Respondent, and/or any other witnesses who are identified during the course of the investigation, as well as gathering available documentary, electronic, or physical evidence.[9]  Parties will be provided with adequate notice of the investigation and a meaningful opportunity to be heard.[10]

18.     The parties are permitted to have an "advisor," defined as any "person selected by the respondent or complainant to assist and accompany them through the University conduct process (including Disciplinary Conferences, Administrative/University Conduct Board Hearings, Sanction Reviews, and formal Appeals)."[11]  The Code prohibits the advisor from "perform[ing] any function in the process other than advising the party and may not make a presentation or represent

---

[8] The 11/3/16 version of the OSC policy states the "OSMPR will typically investigate such allegations utilizing the process articulated at http://titleix.psu.edu." See Exhibit C, 11/3/16 OSC policy, pg. 13.

[9] Exhibit C, 11/3/16 OSC policy, pg. 3, 13; Penn State Student Title IX Report Procedures at http://titleix.psu.edu/psu-title-ix-procedures/ .

[10] Penn State Student Title IX Report Procedures at http://titleix.psu.edu/psu-title-ix-procedures/ .

[11] Exhibit C, 11/3/16 OSC policy, pg. 3.

the party."[12]  The advisor "may not speak on behalf of the advisee" and the Code requires the "parties . . . to ask and respond to questions on their own behalf, without representation by their advisor."[13]

19.    The investigator prepares a "draft Investigative Packet" at "the conclusion of the investigation" using the "material information gathered during the investigation," which does not "contain any findings of responsibility/non-responsibility."[14]

20.    The Code requires that the parties be provided with the "opportunity to meet with the assigned investigator in order to review the draft Investigative Packet, submit additional information or comments, identify additional witnesses or evidence for the investigator to pursue, and submit any additional questions that they believe should be asked of any other party or witness.[15] The assigned investigator incorporates "any revisions or new information into a final Investigative Packet within five (5) business days, if possible. The parties will be provided with an opportunity to review any new information that is added to the Investigative Packet before it is finalized."[16]

---

[12] *Id.* at pg. 4.
[13] *Id.*
[14] Penn State Student Title IX Report Procedures at http://titleix.psu.edu/psu-title-ix-procedures/.
[15] *Id.*
[16] *Id.*

21.     The investigator closes the investigation and forwards the final packet to an OSC "Case Manager" whose job it is "to recommend charges and sanctions, to serve as University presenters in (Title IX) hearing(s), and to monitor and mandate the completion of assigned sanctions."[17]

22.     The case manager recommends charges and sanctions if s/he determines that the investigative packet "reasonably supports a code of conduct violation."[18]   Although the Code contains an extensive "definition" section, it does not define "reasonably supports."

23.     If charges are issued, both the Respondent and Complainant are provided with the opportunity to meet with the case manager to discuss the process and they are notified of their right to submit a written "response to the charges" within five business days. [19]

24.     If a respondent contests the charges, the case manager refers the case and the packet to a Title IX Decision Panel ("Panel") for a hearing that could result in sanctions "ranging from Suspension to Expulsion".  The Panel consists of three University "staff" or "faculty" authorized by, and under the control of, the OSC's Senior Director to adjudicate a respondent's responsibility and sanction.[20]

---

[17] Exhibit C, 11/3/16 OSC policy, pg. 3.
[18] *Id.* at pg. 13. Penn State Student Title IX Report Procedures at http://titleix.psu.edu/psu-title-ix-procedures/.
[19] *Id.*
[20] Exhibit C, 11/3/16 OSC policy, pg. 3, 13-14.

25.    The Code delegates prosecutorial, adjudicative and sanctioning roles to the OSC; the OSC provides the "prosecutor" presenter to a Panel it selects and that operates under its authority, along with its "pre-hearing" finding that the investigative report "reasonably supports" a finding that the respondent violated the Code of Conduct.

26.    The Code prohibits the parties from calling witnesses during the hearing, limiting participation to the parties alone and limiting the scope of any presentation to "highlight[ing] the information that they feel is most relevant to the hearing authority's deliberation" and "respond[ing] to questions that may be posed by the hearing authority and the Investigator, if any."[21]

27.    Although the complainant and respondent may submit questions to be posed to the other party, the Panel will only consider them as a suggestion.[22]  The parties or their advisors may not question, cross examine or confront the other party. The Panel alone determines what proposed questions it will ask and will refuse to pose any proposed question that they don't believe to be both "relevant" and appropriate."  The Code does not define "relevance" or "appropriateness."[23]  The Code contains no provision for a party to ask or pose a follow-up question or present a rebuttal to information a party provides in response to a Panel-posed question.

---

[21] *Id.* at pg. 14.
[22] *Id.*
[23] *Id.*

28.    The Panel uses a "preponderance of the evidence" standard in determining whether the respondent is responsible for the charged misconduct.[24]

29.    The Panel determines a sanction if it finds the Respondent responsible for violating the Code of Conduct.  The parties are informed in writing of the hearing authority's decision and their rights to appeal the decision.[25]

30.    The Code designates a Student Conduct Appeals Officer to review the record. The Officer may not modify or reverse the Panel's decision "without consultation with the Vice President for Student Affairs, (OSC's) Senior Director, or Chancellor."[26]

31.    At the conclusion of any appeal process, both parties are notified in writing of the outcome of the process.[27] There is no further avenue for review following disposition of the appeal.

## C.    The Incident

32.    In the fall of 2015, John Doe enrolled as an 18-year-old freshman at Penn State's Altoona campus following his high school graduation.

33.    During his first semester, Doe and Jane Roe, also a Penn State Altoona freshman, interacted in some shared classes. At this time, John Doe was in a relationship with another individual and Roe and Doe were acquaintances only.

---

[24] *Id.* at pg. 15.
[25] *Id.*
[26] *Id.* at pg. 19.
[27] *Id.*

34.     In the Spring of 2016, after his prior relationship ended, John Doe and Jane Roe socialized more routinely and became closer friends.

35.     John Doe and Jane Roe briefly ceased corresponding or associating with each other when John Doe reconciled with his former girlfriend. This hiatus extended until Mr. Doe and his then girlfriend broke up toward the end of Doe's freshman year.

36.     From August 2016 until approximately November 2016, Doe and Roe began an on-again, off-again, predominately sexual, "friends with benefits" relationship, meeting and engaging in sexual intercourse and texting about sex on multiple occasions.

37.     On November 9, 2016, Roe texted Doe that she had "feelings" for him and wanted an exclusive relationship with him.  Doe texted Roe that he "didn't want a serious relationship . . . . [i]f you want we can be friends with benefits and laugh."

38.     On November 11, 2017, Roe responded, "Then fine we can be friends with benefits if that's what you want but know I won't be fucking other people right now that's not what I want but you can do it on your end if you want."  Doe texted, "Sounds good then" to which Roe responded, "Fine then."

39.     On Saturday, November 12, 2016 at about 7:00 p.m., Jane Roe arrived at Plaintiff's apartment and proceeded directly to Doe's bedroom.

40.     Roe and Doe both agreed that they then engaged in consensual sexual intercourse.

41.     After intercourse, Roe stated that they talked for approximately 3 minutes after which she claims that Doe penetrated her anus, "maybe half," without her consent.  Doe denies these claims.

42.     Roe left Doe's apartment and went first to a friend's dorm room and then to a party later in the evening.

43.     Roe continued to text Doe following the incident.  She contacted him two days later and then again four days later asking him what he was doing and telling him "Mm ok goodnight [Doe]," after he texted her that he was going to sleep.

44.     On December 4, 2016, Roe texted Doe to see if they could "talk" and he responded, "No, please leave me alone, I found someone that's why I don't respond to your texts. [S]top talking to me."[28]

45.     Roe reinitiated text contact with Doe again in July 2017, asking him whether they could "talk."  Doe responded "Yeah, but I have a girlfriend."  Roe stated that she replied, "I hope that you don't hurt her like you hurt me."  When Roe described to Mr. Harris what she meant by that statement she said that she was referring to their November 2016 sexual contact.  Roe stated that Doe told her that he did not "remember it happening that way."  When asked by the investigator about

---

[28] Exhibit D, text messages.

this conversation, Roe told him that Doe brought up her refusal to have anal sex with him that night despite the fact that she told him she had had anal sex with a mutual friend. Doe has consistently denied Roe's accusations of anal penetration -- even in this private conversation and prior to any awareness that Roe would later accuse him of a sexual assault.

## C. Roe's Complaint and the University's Disciplinary Process

46. On September 12, 2017, ten months after the November 12, 2016, sexual encounter, Roe filed a complaint with Penn State's Office of Student Conduct alleging that Doe penetrated her anus without her consent during their otherwise consensual sexual encounter.

47. The Office of Student Conduct referred the matter to the Office of Sexual Misconduct Prevention and Response for investigation.

48. Then "Title IX Compliance Specialist" Christopher Harris[29] conducted the University's Title IX investigation, which included interviewing Roe twice, and interviewing Doe, Roe's roommate and Roe's friend on one occasion. Mr. Harris also reopened the investigation after it was completed to interview Roe a third time.

49. During one of her interviews, Roe claimed to have sought medical attention following the encounter and Mr. Harris requested copies of treatment

---

[29] In the summer of 2018, Christopher J. Harris was named the University's new Title IX Coordinator succeeding Danny Shaha, who served in the role of Title IX Coordinator following the departure of Paul Apicella in 2017.

records. Although Roe told Mr. Harris she would provide the records, she later refused and, on information and belief, refused to authorize Mr. Harris to speak with any medical provider. Roe later conceded that during the medical encounter she had not told her treatment provider that the sexual acts she engaged in were nonconsensual.

50. Mr. Harris prepared a November 9, 2017, draft "Investigative Report" which Doe was required to review on or before December 1, 2017, and to provide any responses within 5 business days.[30]

51. On information and belief, from approximately November 15, 2017 through January 14, 2018, Mr. Harris attempted to contact Roe regarding several issues raised by Doe during the investigation and to give her the 5-day opportunity to comment on the draft. As a result of Roe's failure to respond, Mr. Harris apparently closed the investigation and forwarded the Investigative Packet to OSC Interim Senior Director Karen Feldbaum, who has since become the OSC's Senior Director.[31]

52. On January 14, 2018, Roe responded to Mr. Harris' request for additional information. Despite the fact that Mr. Harris had already forwarded the packet to OSC, and that two months had elapsed since he first began trying to engage

---

[30] See Exhibit E, email communications.
[31] See Exhibit F, email communications.

her, Mr. Harris reopened the investigation and provided Roe with an opportunity to review the report and to explain discrepancies in her and her witness' accounts. Roe and Mr. Harris met on January 19, 2018 and Mr. Harris "asked her a couple of follow-up questions that [he] had planned to ask her if [they had] met at an earlier date."[32]

53.     Mr. Harris revised the draft following the meeting making it more favorable to Roe.   For example, Mr. Harris deleted the previously included information detailing Roe's failure to respond to him.   Mr. Harris also edited the report to include Roe's reconciliation of significant inconsistencies in the Investigative Report.

54.     OSC accepted the edited report: 1) despite Roe's failure to engage with Mr. Harris for approximately seven weeks before he closed the investigation and forwarded the packet to OSC; and 2) a week after the investigation had been closed.

55.     In violation of the Code, Mr. Harris submitted the edited report to OSC without providing Doe with an opportunity to respond or to submit additional information in response to the packet changes.

56.     During a February 27, 2018, meeting with case manager Feldbaum, Feldbaum advised Doe that she felt that the investigation packet "reasonably supported" a conclusion that he had violated two code policies:     02.05

---

[32] Id.

Nonconsensual Intercourse and 02.06 Nonconsensual Confinement or Restraint for Sexual Purposes and set his sanction at an indefinite expulsion for a period not less than a year.

57.    Doe advised Feldbaum that he wished to contest the charges.

58.    By email dated March 16, 2018, Doe requested that Ms. Feldbaum permit Mr. Harris to reopen the investigation (like he had done for Ms. Roe) so that he could provide his version of events and respond to the "new information" that Ms. Roe was encouraged to provide following the initial close of the investigation.[33] On March 26, 2018, Ms. Feldbaum denied his request without explanation.

59.    On April 2, 2018, Mr. Doe provided a written response to the charges which included a statement and text messages from November 9, 2016, a few days before the incident, and several text messages from after the incident.

60.    The OSC selected the members of a Title IX Decision Panel to preside over Doe's April 20, 2018, "hearing."  Prior to the hearing, the OSC provided the investigative packet to the Panel and advised them that it had already concluded that the investigation "reasonably supported" a finding that Doe had violated the code of conduct by engaging in nonconsensual sexual intercourse and by restraining Roe for sexual purposes.

---

[33] Exhibit G, email communications.

61.   During the April 20, 2018 hearing, Roe addressed the panel but provided no information regarding the underlying conduct and allegations. The Panel did not ask her to provide information regarding the incident and did not ask her any questions.

62.   Although Doe wanted to confront and cross-examine Roe regarding the statements attributed to her in the investigative packet, the Code prevented him from doing so.

63.   Although Doe wanted to confront and cross-examine Roe's witnesses regarding statements attributed to them in the investigative packet, many of which directly contradicted Roe, the Code prevented him from doing so.

64.   The Code's prohibition against confrontation and cross examination in Title IX matters is particularly unfair to respondents like Doe in view of the fact that Penn State permits students facing other types of disciplinary charges, most far less serious than Doe's, to request that their own and adverse witnesses testify in person before a hearing panel and be subjected to confrontation and cross examination.

65.   Although Doe was permitted to make a statement to the Panel, the Code limited him to "highlighting" portions of the packet. During his presentation, Doe argued that his text exchanges with Roe immediately preceding the incident evidenced that the encounter was not, as the Panel was later to maintain, merely to "talk."

## E.    The Panel's Decision

66.    On April 26, 2018, the Panel issued a Title IX Hearing Board Report finding Doe "responsible" for violating the Code by engaging in Nonconsensual Intercourse with Complainant and "not responsible" for violating 2.06 Nonconsensual Confinement for Restraint for Sexual Purposes. [34]

67.    The Panel found that Roe and Doe had a "sexual relationship" prior to the incident and that Roe was interested in a romantic relationship.  They found that the contact, including intercourse, just prior to the claimed anal sex was consensual. They noted that the testimony was inconsistent regarding whether:  Doe ever asked for anal sex; Roe was "trapped on the bed after consensual sex had concluded, and; Roe's head was "trapped" against the wall – Roe described it as being "stuck" and uncomfortable but told others that "her neck was going to break . . . kind of choking".

68.    According to the Panel, Doe "convinced" Roe to have "consensual" sexual intercourse and that afterward he "tried to have anal." (quotes in the original). The Panel noted that Roe claimed that Doe penetrated her rectum "maybe half" and that she was "more credible" and that it was "more likely than not" that Doe penetrated or physically attempted to anally penetrate her.

69.    The Panel determined that Doe was the "sexual pursuer" because he was interested in "only a sexual relationship with [Roe] despite her desire for a

---

[34] The decision of the Panel is attached hereto as "Exhibit H."

romantic relationship" and that there was a "pattern . . . of asking for sex and needing to convince her, ending with non-consensual anal intercourse. . . . ".

70.    Although the Panel found that the vaginal intercourse was consensual, and it had contemporaneous text message exchanges explicitly confirming that Roe agreed to a "friends with benefits" relationship with Doe a few days before the incident, they also concluded that Roe's sole reason for going to Doe's apartment on November 12th was to "talk" rather than to engage in sex as they had discussed.

71.    Although the Panel had Roe's text messages indicating that she was still interested in a romantic relationship with Doe beginning *days immediately following the incident and ending 8 months later in July of 2017, two months before she levied her complaint*, it nonetheless found persuasive that Doe "showed a pattern of distress in seeing [Doe]" after the incident.

72.    Although the Panel noted that Doe had raised text message exchanges with Roe on November 10 and 11 as evidence that she was not there merely to "talk," they refused to consider the testimony because he did not provide copies of the texts.

73.    The Panel suspended Doe from Penn State from Summer 2018 through Spring 2019; banned him from the University Park campus even after the suspension was completed if Roe was still enrolled at that campus, and; ordered him to complete

an "assessment and any recommended treatment" and to provide a "favorable evaluation for return."[35]

## F.     The Appeal

74.     On May 3, 2018, Doe submitted his timely appeal[36] to the OSC which, in turn, referred it to Yvonne Gaudelius, currently identified on Penn State's website as Associate Vice President and Senior Associate Dean for Undergraduate Education.  http://undergrad.psu.edu/directory.html.

75.     By decision dated May 15, 2018, Ms. Gaudelius denied the appeal and affirmed the sanctions with the exception of removing the University Park ban and imposing various stay-away provisions in its stead.

76.     In her decision, Ms. Gaudelius noted that Doe's appeal raised "procedural errors," "new evidence," and the "sanction."

77.     In denying the appeal, Ms. Gaudelius wrote, in a boilerplated memorandum and without explanation, "that there was no failure to follow stated procedures, such that the outcome would have been different."

---

[35] *Id.*
[36] Exhibit I, Appeal.

# CAUSES OF ACTION

## *Violation of the Fourteenth Amendment and 42 U.S.C. §1983*

78.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

79.     The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property without due process of law."

80.     Plaintiff has a property interest protected by the Fourteenth Amendment in continuing and finishing his education at Penn State University.

81.     Plaintiff has a liberty interest protected by the Fourteenth Amendment in continuing and finishing his education at Penn State University.

82.     A gap or lapse in education that a student will have to explain forever constitutes irreparable harm and consequently deprive the student of his or her property and liberty interests.

83.     Student disciplinary proceedings at state-funded universities must be conducted in conformity with the Due Process Clause of the Fourteenth Amendment. *Goss v. Lopez*, 419 U.S. 565 (1975).

84.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

85.    The process due and denied to Mr. Doe during the Title IX investigation, hearing and appeal included the right to:

    a.  call witnesses on his own behalf;

    b.  confront and cross examine his accuser and adverse witnesses;

    c.  a fair, unbiased and unconflicted tribunal comprised of individuals who are separate and apart from, and not under, the auspices of the University's Office of Student Conduct "prosecutor";

    d.  the presumption of innocence;

    e.  the active and meaningful participation of his attorney "advisor", including their right to cross examine adverse witnesses;

    f.  the equal opportunity to review and respond to evidence;

    g.  an objective evaluation of all relevant evidence including exculpatory evidence, and;

    h.  equal access to review all of the evidence collected by the investigator, including the investigative report, and an equal opportunity to respond to that evidence before a determination is made.

86.    Penn State's policies and procedures for adjudicating "Title IX allegations" limit an accused student's right to be heard in disciplinary proceedings to the right to be heard only on matters deemed "relevant" and "appropriate" by a "Title IX Compliance Specialist" and included in the "Investigative Packet," the exclusive vehicle for factual submissions to the "Title IX Decision Panel."   Indeed, during the "hearing", the parties are permitted only to "highlight" portions of the packet.

87.    OSC Interim Senior Director Feldbaum's denial of Doe's request to reopen the investigation to review and respond to changes Mr. Harris made to the investigative packet resulting from the January 19, 2018 discussions with Roe violated his rights under Penn State's disciplinary policy.

88.    The Title IX Decision Panel's knowledge that Ms. Feldbaum had already determined that the charges of Nonconsensual Intercourse and Restraint were "reasonably supported" by the evidence and had communicated her finding to a Panel under her control, abrogated Mr. Doe's rights to a fair, unbiased and neutral process.

89.    The process due to Doe in the April 20, 2017, disciplinary proceeding included the right to a standard of proof commensurate with the interests at stake, namely, proof by clear and convincing evidence.

90.    Particularly in light of the Panel's knowledge that Ms. Feldbaum had determined that the charge of Nonconsensual Intercourse was "reasonably supported" by evidence, the preponderance-of-evidence standard of proof employed by the Panel was inadequate to guard against erroneous deprivation of Doe's property and liberty interests.

91.    Defendant's violation of Doe's right to due process during the disciplinary process resulted in an erroneous finding of culpability and his removal

from Penn State, causing him to suffer far-reaching educational, vocational, reputational, and economic harm.

92.    As a direct and proximate result of the above conduct, John Doe sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction enjoining enforcement of the sanctions and requiring an expungement of his disciplinary record.

## DEMAND FOR RELIEF

WHEREFORE, this Court should:

(i)    declare, for the foregoing reasons, that the Defendant violated Plaintiff's Fourteenth Amendment right to due process of law;

(ii)    issue an injunction requiring that the Senior Director of the Office of Student Conduct vacate the Title IX Decision Panel's April 20, 2018, finding that Plaintiff was "responsible" for violating the Code of Conduct by engaging in Nonconsensual Intercourse;

(iii)    issue an injunction requiring that Penn State reinstate Plaintiff as a student in good standing at Penn State;

(iv)    issue an injunction requiring that the Senior Director of the Office of

Student Conduct expunge all aspects of Plaintiff's student disciplinary file pertaining

to the allegations leveled against him by Complainant;

(v)    award to Plaintiff monetary damages, attorney's fees, and costs of suit;

and;

(vi)    award such further relief as deemed necessary and just by this Court.


Respectfully Submitted,


December 10, 2018                                    s/ Andrew Shubin
                                                    Andrew Shubin
                                                    ID #63263
                                                    333 South Allen Street
                                                    State College, PA 16801
                                                    (814) 867-3115
                                                    (814) 867-8811 fax
                                                    shubin@statecollegelaw.com

                                                    *Attorney for Plaintiff,*
                                                    *John Doe*