IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN DOE,                              :        No. 4:18-CV-2350
                                       :
        Plaintiff,                     :        (Honorable Matthew W. Brann)
                                       :
    v.                                 :        Electronically Filed
                                       :
THE PENNSYLVANIA STATE                 :
UNIVERSITY,                            :
                                       :
        Defendant.                     :

## JOHN DOE'S BRIEF IN OPPOSITION TO DEFENDANT PENN STATE'S MOTION TO DISMISS

Dated: April 5, 2019

Andrew Shubin, Esq.
PA ID#63263
Shubin Law
333 South Allen Street
State College, PA 16801
(814) 867-3115
(814) 867-8811 fax
shubin@shubinlaw.com
*Attorney for Plaintiff,*
*John Doe*

# **TABLE OF CONTENTS**

I. Factual and Procedural History
    A. Penn State's Title IX Protocol ...................................................2
    B. The Incident ...........................................................................4
    C. Roe's Complaint and the University's Disciplinary Process.....................6
    D. The Panel's Decision ...............................................................9
    E. The Appeal .........................................................................10

II. Argument
    A. The Plaintiff Has Plausibly Stated a Claim that the Defendants Violated His Clearly Established Right to Procedural Due Process..................... 11

        1. The Constitution Guarantees an Accused Student the Right to Confront Adverse Witnesses During "He said/She said" Sexual Misconduct Disciplinary Hearings............................................... 13

        2. The Constitution Guarantees Doe the Right to Advisor Participation .................................................................. 18

        3. Penn State's Failure to Provide Doe with a Fair Process and Unbiased Decisionmakers Violated the Constitution. ................. 20

            a. Penn State Violated the Constitution by Failing to Limit the Investigator's Power to Funnel and Filter Evidence, Including Exculpatory Evidence, Related to the Accusation................. 20

            b. Penn State Violated the Constitution by Failing to Provide Doe With a Process that Followed its Own Rules and that was Fair and Equitable........................................................ 21

            c. Penn State Violated the Constitution by Failing to Provide Doe with an Unbiased Tribunal.................................... 22

            d. Penn State Violated the Constitution by Using the Lowest Standard of Evidence in Finding Doe Responsible for a Quasi-Criminal Charge of Sexual Assault ........................................ 24

III. Conclusion ..................................................................... 26

# **Table of Citations**

*Biliski v. Red Clay Consol. Sch. Dist. Bd. Of Educ*., 574 F.3d 214 (3d Cir. 2009).12

*Doe v. Alger* (James Madison University), 228 F. Supp. 3d 713, 730 (W.D. Va. 2016) ...................................................................................................................17

*Doe v. Baum*, 903 F.3d 575, 578, 581, 582, 583 (6th Cir. 2018) ..........12, 16, 18, 19

*Doe v. Brandeis Univ*., 177 F.Supp. 3d 561, 606 (D.Mass. 2016) .........................24

*Doe v. Claremont McKenna College (CMC)* 25 Cal.App.5th 1055, 1070 (2nd Appl. Dist., Div. 1, 2018)..........................................................................................17

*Doe v. Cummins*, 662 F.App'x 437, 446 (6th Cir. 2016*, citing Goss*, 419 U.S. at 574-75) ...................................................................................................................25

*Doe v. Miami University*, 882 F.3d 579, 600 (C.A.6 (Ohio), 2018).......................24

*Doe v. Ohio State Univ*. 311 F.Supp.3d 881, 892-893 (S.D.Ohio. 2018) ...............21

*Doe v. Penn. State University,* No. 4:18-CV-00164, 2018 U.S. Dist. LEXIS 141423, at 11 (M.D. Pa. Aug. 21, 2018)...........................................................17, 24

*Doe v. Pennsylvania State Univ*., 336 F.Supp. 3d 441, 449- 450 (M.D. Pa. 2018) .... .........................................................................................................................17, 21

*Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir.2017)(*citing Doe v. Cummins*, 662 Fed.Appx 437, 445 (6th Cir. 2016)...................................................11

*Doe v. Univ. of Mississippi, 3:18-cv-00138-DPJ-FKB (S.D. Miss. 2019)*........25, 26

*Doe v. Univ. of S. California, 29 Cal. App. 5th 1212, 1233, 241 Cal. Rptr. 3d 146, 163 (Ct. App. 2018), reh'g denied (Dec. 27, 2018)*.................................................17

*Doe v. University of Cincinnati*, 872 F.3d 393, 399, 400, 401, 402, 403 (6th Cir. 2017) (quoting *Cummins*, 662 Fed.Appx. at 446) ...........................13, 15, 16, 17, 24

*Doe v. University of Michigan,* No.2:18-cv-11776- AJT-EAS, Docket 30, (S.D.MI. July 6, 2018)..........................................................................................................17

*Doe v. University of So. Miss.*, No. 2:18-cv-00153 (S.D. Miss. Sept. 26, 2018) ....17

*Duke v. North Texas State Univ.*, 469 F.2d 829, 834 (5th Cir. 1972) .....................23

Ellman–Golan, *Saving Title IX: Designing More Equitable and Efficient Investigation Procedures*, *supra*, at 175 ...................................................................24

*Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005).............................15
*Furey v. Temple Univ*, et al., 884 F.Supp.2d 35, 223, 231, 246, 253, 254 (E.D. Pa. 2012) ....................................................................................................11, 13, 18, 19

*Furey v. Temple University*, 730 F.Supp.2d 380, 394 (E.D. Pa. 2010)...................12

*Furey v. Temple University*, 884 F. Supp. 2d 223, 252, 255 (E.D. Pa. 2012)...16, 22

*Goldberg v. Kelly*, 397 U.S. 254, 269-270 (1970)............................................13, 14

*Gorman v. University of Rhode Island, Gorman v. Univ. of R.I.,* 837 F.2d 7, 14, 15, 16 (1st Cir. 1988) .......................................................................................13, 23, 25

*Goss v. Lopez,* 419 U.S. 565, 579, 581, 583 (1975), 95 S.Ct. 729 (1975) ..11, 12, 25

*Grannis v. Ordean*, 234 U.S. 385, 394 (1914) ......................................................12

*Haney v. West Chester Univ.*, C.A.No. 18-02456, 2018 WL 3917975 at *8 ..........19

*Johnson v. Temple Univ.*, E.D. Pa. No. 12-515, 2013 U.S. Dist. LEXIS 134640, at 22 (Sep. 19, 2013) ...................................................................................................24

*Johnson v. Temple University--of Commonwealth System of Higher Educ.*, 2013 WL 5298484, at 8 (E.D.Pa.,2013) ..........................................................................21

*Lee v. the Univ. of New Mexico*, 1:17-cv-01230-JB-LF (D.N.M. Sep. 20, 2018)...25

*Lee v. The University of New Mexico*, Case 1:17-cv-01230-JB-LF, pp. 2-3 (D. NM. 2018) ................................................................................................................17

*Mathews v. Eldridge*, 424 U.S. 319, 334, 335 (1976) ................................12, 15, 25

*McClure,* 456 U.S. at 195 ......................................................................................22

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61462 at 61498 (proposed November 29, 2018).*.................................................................................17, 19, 20

*Osei v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, No. CIV.A. 10-2042, 2011 WL 4549609, at 10 (E.D. Pa. Sept. 30, 2011), *aff'd sub nom. Osei v. Temple Univ.*, 518 F. App'x 86 (3d Cir. 2013) ........................................................19

*Park v. Temple Univ.*, E.D.Pa. No. 16-5025, 2018 U.S. Dist. LEXIS 46765, at 4 (Mar. 20, 2018) ......................................................................................................24

*Plummer v. Univ. of Houston*, 860 F.3d 767, 782-83 (5th Cir. 2017)...............25, 26

*Simms v. Pa. State Univ.-Altoona*, 2018 WL 1413098, at 5 (W.D. Pa. 2018) ........19

*Winnick v. Manning,* 460 F.2d 545, 549, 550 (2nd Cir. 1972).........................13, 14

*Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507 (1971)....................11

*Withrow v. Larkin,* 421 U.S. 35, 47 (1975) .............................................................22

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN DOE,                                    :
        *Plaintiff*          :
                            :
        v.                  :          Civil Action No. 4:18-CV-2350
 
                            :
THE PENNSYLVANIA STATE               :
UNIVERSITY                           :
                            :
        *Defendants*         :

## JOHN DOE'S BRIEF IN OPPOSITION TO PENN STATE'S MOTION TO DISMISS

On December 10, 2018, John Doe, a nineteen-year-old, 3rd-year Penn State Electrical Engineering student, filed a civil rights complaint against the Pennsylvania State University ("PSU") seeking monetary damages and an order invalidating the two-semester suspension imposed based upon a Title IX Hearing Panel's finding that he sexually assaulted Jane Roe.  Penn State moved to dismiss the complaint contending that the "disciplinary process. . . gave Doe a sufficient, meaningful opportunity to 'respond, explain, and defend.'"  PSU's motion should be denied because its process deprived Doe of the most basic due process protections, including the rights to: call witnesses; confront and cross examine his accuser and adverse witnesses; a fair, unbiased tribunal; the presumption of

innocence; active and meaningful participation of his attorney "advisor", and; equal right to respond to investigator collected evidence.

## I.   Factual and Procedural History

### A.   Penn State's Title IX Protocol

The Office of Student Conduct ("OSC") administers PSU's disciplinary system and promulgates a Code of Conduct outlining the process' "standard procedures and practices."  PSU uses an "Investigative Model" in Title IX cases.[1] OSC refers sexual misconduct allegations to the University's Office of Sexual Misconduct Prevention and Response ("OSMPR") which assigns an investigator to gather "reasonably available" information which may include interviewing the Complainant, Respondent, and/or any other identified, as well as gathering available documentary, electronic, or physical evidence.[2]

PSU's policies limit an accused's ability to obtain meaningful assistance; a party may consult with an "advisor" who is not permitted to "perform any function in the process other than advising the party."  Advisors cannot represent, present, or speak on the advisee's behalf, and must remain mute during a hearing.[3]   The policy requires "parties . . . [to] ask and respond to questions on their own."[4]

---

[1] The 11/3/16 version of the OSC policy states the "OSMPR will typically investigate such allegations utilizing the process articulated at http://titleix.psu.edu/psu-title-ix-procedures/. Exhibit C of Plaintiff's Complaint, OSC policy (November 3, 2016).

[2] *Id.* at 3, 13.

[3] *Id.* at 4.

[4] *Id.*

The investigator prepares an "Investigative Packet" and provides the parties with the opportunity to review the draft, and five business days to submit information or comments, identify additional witnesses or evidence, and submit additional questions to a party or witness.[5]   The investigator forwards the final Packet to an OSC "Case Manager . . . to: recommend charges and sanctions; serve as the University's Title IX hearing presenter, and, monitor and mandate the completion of assigned sanctions."[6]   The case manager recommends charges and sanctions if s/he determines that the investigative packet "reasonably supports a code of conduct violation."[7]   The case manager provides the parties with an opportunity to discuss the process and five days to submit a written "response to the charges."[8]   When a respondent contests the charges, the case manager refers the case and the packet to a Title IX Decision Panel ("Panel") for a hearing that could result in sanctions "ranging from Suspension to Expulsion".[9]   The Panel is comprised of three University "staff" or "faculty" chosen by, and under the control of, OSC's Senior Director.[10]   The Code delegates prosecutorial, adjudicative, and sanctioning roles to the OSC case manager; the OSC provides the "prosecutor" Panel presenter and its determination that the Packet "reasonably supports" a sexual assault finding.

---

[5] *Id.*
[6] *Id.* at 3.
[7] *Id.* at 13.
[8] *Id.*
[9] *Id*.
[10] *Id*. at 3, 13-14.

The Code prohibits parties from calling witnesses and limits the parties to "highlight[ing] the information that they feel is most relevant to the hearing authority's deliberation" and "respond[ing]" to the Panel's questions.[11]  The policy prohibits cross examination or direct confrontation. Instead, the parties may "suggest" questions for the Panel to ask of the other party.[12]  The Panel will refuse to pose questions it deems "[ir]relevant" or "[in]appropriate", an undefined term.[13]  The Code prohibits follow-up questions or rebuttal to information elicited in response to a Panel-posed question.  The Panel uses a "preponderance of the evidence" standard to determine  responsibility.[14]  The Panel informs parties of its decision and the right to appeal, and issues sanctions.[15]  OSC designates a Student Conduct Appeals Officer to review any appeal and issue a written determination.[16]  There is no further avenue for review.

## B.    The Incident[17]

In the fall of 2015, 18-year-old Doe and Roe met as Penn State Altoona freshman.  From August to November 2016, Doe and Roe began an on-again, off-again, predominately sexual, "friends with benefits" relationship, meeting and

---

[11] *Id.* at 14.
[12] *Id.*
[13] *Id.*
[14] *Id.* at 15.
[15] *Id.*
[16] *Id.* at 18
[17] *See* Complaint ¶¶ 32-45.

engaging in sexual intercourse and texting about sex on multiple occasions. On November 9, 2016, Roe texted Doe that she had "feelings" for him and wanted an exclusive relationship. Doe texted that he "didn't want a serious relationship . . . . [i]f you want we can be friends with benefits and laugh." On November 11, 2017, Roe responded, "fine we can be friends with benefits if that's what you want but know I won't be fucking other people right now that's not what I want but you can do it on your end if you want." Doe texted, "Sounds good then" and Roe replied, "Fine then."

On Saturday, November 12, 2016, at about 7:00 p.m., Roe and Doe had consensual sexual intercourse in Doe's bedroom. Roe claims they then talked for 3 minutes after which Doe "maybe half" penetrated her anus without consent. Roe went to a friend's dorm room and then to a party. Doe denied that they had anal sex.

Roe texted Doe two and four days later asking him what he was doing, telling him, "Mm ok goodnight [Doe]," after he texted her that he was going to sleep. In a December 4, 2016 text, Roe asked to "talk" and Doe responded, "No, please leave me alone, I found someone that's why I don't respond to your texts. [S]top talking to me."[18] Roe texted Doe in July 2017, again asking to "talk." Doe responded "Yeah, but I have a girlfriend." Roe stated that she replied, "I hope that you don't hurt her like you hurt me." Doe replied that he did not "remember it happening that

---

[18] Exhibit D of Plaintiff's Complaint, text messages.

way" reminding her that she refused to have anal sex after telling him that she had done so with a mutual friend. Doe consistently denied having anal sex; beginning with this private conversation before he knew Roe would make a formal complaint.

## C.    Roe's Complaint and the University's Disciplinary Process

On September 12, 2017, Roe filed a Title IX complaint alleging that Doe penetrated her anus without her consent during their otherwise consensual sexual encounter. OSC referred the matter to the OSMP "Title IX Compliance Specialist" Christopher Harris,[19] to investigate and to prepare an Investigative Packet. Harris' investigation included twice interviewing Roe, and a single interview of Doe, Roe's roommate, and Roe's friend. Harris reopened the "closed" investigation to provide Roe, who ignored Harris' attempt to speak with her in the preceding months, a third opportunity to add to the investigation and reconcile contradictions.

Roe told Harris that the encounter prompted her to seek medical treatment and promised to provide treatment records. Roe later refused and later admitted that she did not report the encounter as nonconsensual to the treatment provider. Harris, who did not force the issue, effectively prevented Doe and the Panel from reviewing admittedly this exculpatory record.

---

[19] In the summer of 2018, Christopher J. Harris was named the University's new Title IX Coordinator succeeding Danny Shaha, who served in the role of Title IX Coordinator following the departure of Paul Apicella in 2017.

Harris prepared a November 9, 2017, "Investigative Packet" and gave Doe five days to respond.[20]   On information and belief, from approximately November 15, 2017 through January 14, 2018, Harris unsuccessfully attempted to engage Roe prompting him to forward the Packet to OSC Interim Senior Director Karen Feldbaum on January 12.[21]

In contrast to its hard, policy-dictated deadlines imposed upon Doe, PSU reopened the investigation on January 19, 2018, to permit Roe to reconcile discrepancies in her and her witness' accounts.[22]   In spite of the outstanding medical record request, Harris included her reconciliation of material inconsistencies and deleted previously included information detailing her failure.   Harris violated policy by sending the Packet directly to OSC without providing Doe with an opportunity to review, respond or submit information in response to the modifications.

During a February 27, 2018, meeting, Director Feldbaum told Doe that she concluded that the Packet "reasonably supported" a conclusion that he sexually assaulted Roe.   Doe requested a hearing.   By March 16, 2018, email, Doe requested that the investigation be reopened so that he could provide his version of events (he had chosen not to while a criminal prosecution was pending) and respond to the "new information" that Roe provided following the initial closing of the

---

[20] Exhibit E of Plaintiff's Complaint, email communications.
[21] Exhibit F of Plaintiff's Complaint, email communications.
[22] *Id.*

investigation.[23]   On March 26, 2018, Feldbaum denied Doe's request without explanation.  On April 2, 2018, Doe provided a written response and text messages from November 9, 2016, a few days before the incident, and several text messages from after the incident in which Roe continued in her attempts to be with Doe.[24]

Feldbaum selected a Panel to preside over Doe's April 20, 2018, "hearing." Prior to the hearing, Feldbaum, who by then had become OSC's Senior Director, provided the Investigative Packet to the Panel and advised them that the record "reasonably supported" the conclusion that Doe sexually assaulted Roe.  Although Doe was permitted to make a statement, the Code limited him to "highlighting" portions of the packet. Roe provided no information regarding the underlying conduct and allegations and the Panel asked her no questions.  Although Doe wanted to confront and cross-examine Roe and her witnesses regarding contradictory evidence, the Code prevented him from doing so.   Inexplicably, PSU prohibits confrontation and cross examination of the accuser and witnesses in Title IX proceedings, while permitting students facing other types of disciplinary charges, most far less serious, to present live witnesses to a panel comprised of students and staff and to directly cross examine the accuser and her witnesses.[25]

---

[23] Exhibit G of Plaintiff's Complaint, email communications.
[24] Exhibit D of Plaintiff's Complaint, text messages.
[25] 11/3/16 OSC policy, Section 5(B)(1)(h) states, "the respondent will be allowed to ask questions of all witnesses." Exhibit C of the Plaintiff's Complaint at 11.

### D.     The Panel's Decision

In its April 26, 2018, decision, the Panel found Doe "responsible" for engaging in nonconsensual intercourse.[26]   The Panel found that Roe and Doe had a "sexual relationship" prior to the incident and that Roe was interested in a romantic relationship.  They found that the contact, including intercourse, just prior to the claimed anal sex was consensual.  The Panel noted that although the testimony was inconsistent regarding whether Doe asked for anal sex, they determined that Doe "convinced" Roe to have "consensual" sexual intercourse and that afterward he "tried to have anal." The Panel noted that Roe claimed that Doe "maybe half" penetrated her rectum and that she was "more credible" and that it was "more likely than not" that Doe penetrated or physically attempted to anally penetrate her. Despite the text records, the Panel found that Roe's sole reason for going to Doe's apartment on November 12th was to "talk".  The Panel determined that Doe was the "sexual pursuer" because he was only interested in "a sexual relationship with [Roe] despite her desire for a romantic relationship" and that there was a "pattern . . . of asking for sex and needing to convince her, ending with non-consensual anal intercourse. . . ."[27]

---

[26] The decision of the Panel is attached to the Plaintiff's Complaint as "Exhibit H."
[27] Exhibit H of the Plaintiff's Complaint.

Although the Panel had Roe's text messages indicating that she was still interested in a romantic relationship with Doe beginning *days immediately following the incident and ending 8 months later in July of 2017, two months before she levied her complaint*, it nonetheless found it persuasive that Doe "showed a pattern of distress in seeing [Doe]" after the incident.  While the Panel noted that they refused to credit Doe's testimony regarding sexual text message exchanges with Roe on November 10 and 11 because he did not provide physical copies of the texts, it voiced no issue with Roe's refusal to provide exculpatory medical records.  The Panel suspended Doe for two semesters from Summer 2018 through Spring 2019.[28]

### E.    The Appeal

On May 3, 2018, Doe submitted his appeal[29] to the OSC which referred it to Yvonne Gaudelius, identified on Penn State's website as Associate Vice President and Senior Associate Dean for Undergraduate Education. http://undergrad.psu.edu/directory.html.  On May 15, 2018, Gaudelius denied the appeal in a boiler-plated memorandum and without explanation, the generic conclusion that "that there was no failure to follow stated procedures, such that the outcome would have been different."

---

[28] *Id.*
[29] Exhibit I of the Plaintiff's Complaint, Appeal.

II.   <u>**Argument**</u>[30]

    A.   **The Plaintiff Has Plausibly Stated a Claim that the Defendants Violated His Clearly Established Right to Procedural Due Process**

It is beyond cavil that a year-long suspension implicates a protected property interest[31] and a sexual assault disciplinary record may "impugn [a student's] reputation and integrity, thus implicating a protected liberty interest."[32] Accordingly, an accused state-funded school student is entitled to procedural due process in a disciplinary action.[33] The "requirement of due process is a requirement of fundamental fairness" [34] such that the level of process required varies with the nature of interests affected and the circumstances surrounding the deprivation.   At a minimum, an accused student must be provided with "notice and an opportunity for a hearing appropriate to the nature of the case."[35]  "Longer suspensions or expulsions

---

[30] The plaintiff will not recite 12(b)(6) boilerplate law given the Court's familiarity with the standard.

[31] *Goss v. Lopez,* 419 U.S. 565, 581 (1975) (holding that due process required notice and opportunity to present his side of the story for a ten-day suspension).

[32] *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir.2017)(*citing Doe v. Cummins*, 662 Fed.Appx 437, 445 (6th Cir. 2016)). *See Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507 (1971) (holding that where "a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," the minimal requirements of due process must be satisfied).

[33] *Furey v. Temple Univ*, et al., 884 F.Supp.2d 223, 246 (E.D. Pa. 2012).

[34] *Id.*

[35] *Id.(citing Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729 (1975)).

for the remainder of the school term, or permanently, may require more formal procedures."[36]

"When it comes to due process, the 'opportunity to be heard' is the constitutional minimum."[37] To identify "the specific dictates of due process," our district courts consider the three factors identified in *Mathews v. Eldridge*[38]:

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[39]

Therefore, due process is "not a technical conception with a fixed content unrelated to time, place and circumstances;"[40]  Instead, due process requires a "flexible" standard and "calls for such procedural protections as the particular situation demands."[41]

---

[36] *Goss v. Lopez*, 419 U.S. 565, 583 (1975).
[37] *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) *citing Grannis v. Ordean*, 234 U.S. 385, 394 (1914).
[38] 424 U.S. 319, 335 (1976).
[39] *Furey v. Temple University*, 730 F.Supp.2d 380, 394 (E.D. Pa. 2010). The District Court in *Furey* determined, on the basis of *Biliski v. Red Clay Consol. Sch. Dist. Bd. Of Educ.*, 574 F.3d 214 (3d Cir. 2009), that the *Mathews v. Eldridge* factors should be considered in determining the process that is due in school disciplinary proceedings.
[40] *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)(internal citations omitted).
[41] *Id*. (internal citations omitted).

When credibility is at issue in a more serious charge, "the importance of a fair tribunal, where the testimony of all of the witnesses is examined for truthfulness, is heightened."[42]   In circumstances similar to where credibility of the accuser and of her account is the only consideration for the decision maker, due process demands the right to confront and cross-examine the accuser and adverse witnesses; a fair, unbiased and unconflicted hearing panel; the presumption of innocence; and, the active and meaningful participation of an accused's attorney "advisor".

### 1. The Constitution Guarantees an Accused Student the Right to Confront Adverse Witnesses During "He said/She said" Sexual Misconduct Disciplinary Hearings

Doe has the right to confront adverse witnesses when the information supplied by those witnesses is the reason for the adverse action and there is a credibility question to be resolved by the fact finder.[43]   In *Goldberg*,[44] the Supreme Court held that the Due Process requires an evidentiary hearing before the government could terminate a welfare recipient's benefits.   The Court held that while there is no right to a formal trial, due process requires an opportunity for the aggrieved person to confront and cross-examine adverse witnesses.[45]   The Court said, "[I]n almost every

---

[42] *Furey v. Temple,* et al., 884 F.Supp.2d 223, 254 (E.D. Pa. 2012).
[43] *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Winnick*, 460 F.2d at 549; *Gorman*, 837 F.2d at 16; *Univ of Cincinnati*, 872 F.3d at 401.
[44] *Goldberg v. Kelly*, 397 U.S. 254 (1970).
[45] 397 U.S. at 269-270.

setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."[46]

In *Winnick v. Manning*[47], the Second Circuit held that there was no requirement that a student be able to cross-examine a witness whose testimony is not determinative to the outcome of the disciplinary hearing.[48]   Significantly, the *Winnick* court noted, "if this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing."[49]   In *Gorman v. University of Rhode Island*,[50] the First Circuit observed that a school complies with constitutional requirements by providing a student "the opportunity to cross-examine his accusers as to the incidents and events in question."[51]   The *Gorman* court further observed that while there is no right to "unlimited" cross-examination, due process requires some cross-examination to permit an accused to elicit "the truth about the facts and events in issue."[52]

More recently, in *Doe v. University of Cincinnati*[53], the Sixth Circuit held: "Accused students must have the right to cross-examine adverse witnesses in the

---

[46] *Id.*
[47] 460 F.2d 545 (2nd Cir. 1972).
[48] *Id*. at 549.
[49] *Id*. at 550.
[50] *Gorman v. Univ. of R.I.,* 837 F.2d 7 (1st Cir. 1988).
[51] 837 F.2d at 16.
[52] *Id.*
[53] *Doe v. University of Cincinnati*, 872 F.3d 393 (6th Cir. 2017).

most serious of cases."[54]  In that case, the court considered a situation where the alleged victim did not appear at an accused student's disciplinary hearing.  The court observed:

> The right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings.  However, general rules have exceptions, and "the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. [55]

Applying the *Mathews* test, the court held that the absence of cross-examination violates an accused student's right to due process because it impacts the reliability of the entire process.  The court said:

> [The school] assumes cross-examination is of benefit only to [the accused student]. In truth, the opportunity to question a witness and observe her demeanor while being questioned can be just as important to the trier of fact as it is to the accused…Few procedures safeguard accuracy better than adversarial questioning.[56]

The court further elaborated on cross examination's indispensability to the entire adjudicative process:

> But if a university's procedures are insufficient to make issue[s] of credibility and truthfulness...clear to the decision makers, that institution risks removing the wrong students, while overlooking those it should be removing.  The concern would be mostly academic if the disciplinary process were a totally accurate, unerring process, never mistaken and never unfair. Unfortunately, that is not the case, and no one suggests that it is.  Cross-examination, the principal means by which the believability of a witness and the truth

---

[54] 872 F.3d at 401, *quoting Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005).
[55] 872 F. 3d at 400 (internal citations omitted).
[56] 872 F.3d at 401 (citations omitted).

of his testimony are tested, can reduce the likelihood of a mistaken exclusion and help defendants better identify those who pose a risk of harm to their fellow students.[57]

In *Furey v. Temple University*,[58] a case not involving sexual assault allegations, the court held that due process required that the plaintiff be permitted to cross-examine witnesses.[59]  The court observed that the purpose of cross examination is to permit the accused to challenge the credibility and truthfulness of witnesses, and particularly where facts are in dispute and witness credibility is important, cross-examination of witnesses is "an important safeguard."[60]  "Due process requires cross-examination in circumstances like these because it is the greatest legal engine ever invented for uncovering the truth."[61] The Sixth Circuit similarly reasoned:

> Cross-examination is essential in cases like Doe's because it does *more* than uncover inconsistencies—it takes aim at credibility like no other procedural device. Without the back-and-forth of adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence or potential ulterior motives. Nor can the fact-finder observe the witness's demeanor under that questioning.[62]

The Department of Education's Office of Civil Rights proposed regulation, although not controlling, reflects its conclusion that Due Process require a "live hearing" at which cross-examination must be permitted and conducted by a party's

---

[57] *Id*. at 403 (citations omitted)
[58] *Furey v. Temple University*, 884 F. Supp. 2d 223 (E.D. Pa. 2012).
[59] *Id.* at 252.
[60] *Id.* at 252.
[61] *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) (internal citation omitted).
[62] *Id.* at 582.

"advisor."[63]  This requirement is consistent with trending case law in which courts increasingly stress cross examination's importance in achieving fair sexual assault adjudications, particularly when credibility is at issue.[64]

In Doe's he said/she said credibility driven adjudication, PSU's policies fell short of protecting Doe's due process rights.  To the contrary, PSU handcuffed Doe by requiring him to submit "suggested" questions to a Panel which then decides whether the inquiry is "relevant" and "appropriate" – a term which PSU fails to define or cabin.[65]  PSU policy does not provide an accused with the ability to pose follow up questions or to introduce previously unidentified impeachment evidence. The Court should swiftly reject PSU's contention that this funneled and filtered questioning, without an ability to follow up or impeach, suffices as meaningful cross examination.  Due process requires the "back-and-forth of adversarial questioning"

---

[63] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61462 at 61498 (proposed November 29, 2018). See attached hereto as Exhibit 1.

[64] *Doe v. Baum* (University of Michigan) 903 F.3d at 578; *Doe v. University of Cincinnati*, 872 F.3d 393, 399-402 (6th Cir. 2017) ("[t]he ability to cross-examine is most critical when the issue is the credibility of the accuser."); *Doe v. Univ. of S. California*, 29 Cal. App. 5th 1212, 1233, 241 Cal. Rptr. 3d 146, 163 (Ct. App. 2018), reh'g denied (Dec. 27, 2018) (decision-maker must be able to see witness respond to questions); *Doe v. Claremont McKenna College (CMC)* 25 Cal.App.5th 1055, 1070 (2nd Appl. Dist., Div. 1, 2018); *Doe v. University of Michigan,* No.2:18-cv-11776-AJT-EAS, Docket 30, (S.D.MI. July 6, 2018); *Doe v. Alger* (James Madison University), 228 F. Supp. 3d 713, 730 (W.D. Va. 2016); *Lee v. The University of New Mexico*, Case 1:17-cv-01230-JB-LF, pp. 2-3 (D. NM. 2018); *Doe v. University of So. Miss.*, No. 2:18-cv-00153 (S.D. Miss. Sept. 26, 2018); *Doe v. Penn. State University,* No. 4:18-CV-00164, 2018 U.S. Dist. LEXIS 141423 (M.D. Pa. Aug. 21, 2018).

[65] *E.g.*, *Doe v. Pennsylvania State Univ.*, 336 F.Supp.3d 441, 450 (M.D. Pa. 2018)(court noting no guidelines exist in PSU's Code of Conduct to guide discretion of investigator with choosing to ask or rephrase questions requested by accused to ask of accuser).

when an accuser's credibility is the key to ensuring an accurate result from the decisionmaker.[66]

To be clear, Doe is not asserting that there is an unlimited right to cross-examination in school disciplinary proceedings or that stating a viable claim on this issue requires the Court to adopt an all or nothing approach. While he acknowledges that the outer-parameters of that right may be, as yet, ill-defined, confrontation and cross examination when there are material factual disputes whose resolution revolves around "he said/she said" credibility determinations falls squarely within the Due Process heartland.

## 2. The Constitution Guarantees Doe the Right to Advisor Participation

Although *Furey* held that having counsel advising at the hearing and through the disciplinary process was sufficient in an aggravated assault of a police officer case which did not involve a pending criminal charge issue, the court acknowledged different circumstances may require heightened due process protections.[67] The Third Circuit has "not directly faced the question of whether procedural due process gives an accused student the right to have her counsel actively participate in her

---

[66] *Doe v. Baum*, 903 F.3d 575, 581-583 (6th Cir. 2018)

[67] *Furey*, 884 F.Supp. 2d at 35 ("Courts have also speculated that due process could require active representation by counsel when the school's case is presented by an attorney or the procedures are unusually complex").

student disciplinary hearing."[68] While other district courts in our Circuit confronted the question of whether students are *generally* entitled to attorney advisors and found that no such entitlement exists, these cases were generally not "he said/she said" sexual assault cases that turned on believing the accuser or the accused.[69]

In *Baum*, the Sixth Circuit recognized that the accused student may not always have the right to *personally* confront his accuser and other witnesses.

> [I]n circumstances like these, the answer is not to deny cross-examination altogether. Instead the university could allow the accused student's agent to conduct cross-examination on his behalf. After all, an individual aligned with the accused student can accomplish the benefits of cross-examination—its adversarial nature and the opportunity for follow-up—without subjecting the accuser to the emotional trauma of directly confronting her alleged attacker.[70]

The U.S. Department of Education's Office of Civil Rights ("ED/OCR") proposed a regulation requiring University's to permit advisor cross examination at live hearings.[71] Allowing cross-examination through an attorney-advisor in sexual assault cases would provide the benefits of cross examination while balancing the

---

[68] *Haney v. West Chester Univ.*, C.A.No. 18-02456, 2018 WL 3917975 at *8 (*citing Simms v. Pa. State Univ.-Altoona*, 2018 WL 1413098, at 5 (W.D. Pa. 2018).

[69] *E.g., Furey*, 884 F. Supp. 2d at 231, 253 (disciplinary proceeding for alleged aggravated assault of an officer); *Osei v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, No. CIV.A. 10-2042, 2011 WL 4549609, at 10 (E.D. Pa. Sept. 30, 2011), *aff'd sub nom. Osei v. Temple Univ.*, 518 F. App'x 86 (3d Cir. 2013) (student charged under school code for sending threatening emails to university faculty).

[70] *Doe v. Baum*, 903 F.3d 575, 583 (6th Cir. 2018)(opining that adversarial cross-examination could be achieved via modern technology such as Skype or through questioning by an accused student's agent instead of direct cross-examination by the accused).

[71] 83 Fed. Reg. 61462 at 61498 (proposed November 29, 2018). See Exhibit 1.

concerns of inflicting unnecessary trauma on a complainant through personal confrontation with the respondent.[72]

### 3. Penn State's Failure to Provide Doe With a Fair Process and Unbiased Decisionmakers Violated the Constitution

### a. Penn State Violated the Constitution by Failing to Limit the Investigator's Power to Funnel and Filter Evidence, Including Exculpatory Evidence, Related to the Accusation.

Penn State's policy delegated a "neutral fact-finding" role to Investigator Harris making him, in effect, an information funnel: he alone decided what to include or exclude from the Packet; who to interview; how much or how little to follow-up on leads; how to characterize the information he had received, and; whether to pursue or require (in this case) known exculpatory information that the accuser promised to provide. He alone decided what was "relevant" and "appropriate". The policy did not require Harris to share with Doe the information he has excluded or witnesses he decided not to interview, let alone why. Worse yet, Doe was given no opportunity to challenge Mr. Harris "appropriateness" filter. As a result, the process

---

[72] On November 16, 2018, the U.S. Department of Education released its proposed Title IX regulations which includes due process protections such as presumption of innocence throughout the grievance process; written notice of allegations and an equal opportunity to review all evidence collected, and the right to cross-examination in a live hearing where the cross-examination would be conducted through the parties' advisors. In support, the regulations state that the "Department has determined that at institutions of higher education, where most parties and witnesses are adults, grievance procedures must include live cross-examining at the hearing." *See Id.* The proposed regulations balance "the importance of cross-examination with any potential harm from personal confrontation between the complainant and the respondent by requiring questions to be asked by an advisor aligned with the party." *Id.*

did not permit Doe to challenge, or provide additional context to inform, Harris' relevancy and appropriateness determinations.[73] As such, these are practically the same procedures that were in place in *Doe v. Pennsylvania State University*[74] where the testimony "filtered" through an investigator with little to no visibility into the guidelines or parameters guiding the investigator or "cabining his discretion."[75] Although there were minor changes to the Code, such as the Investigator forwarding the Investigative Packet to the Case Manager for a "pre-hearing" disposition—this effectively only adds to the bureaucracy but does not functionally provide greater due process or greater protections when credibility is critical to the matter.

### b. Penn State Violated the Constitution by Failing to Provide Doe With a Process that Followed its Own Rules and that was Fair and Equitable.

"[I]nconsistent application of procedures" and "significant and unfair departures from an institution's procedures can amount to a violation of due process."[76] Penn State permitted Doe's accuser to ignore Mr. Harris's various entreaties over the course of at least two months, including multiple requests to

---

[73] *E.g., Doe v. Ohio State Univ*. 311 F.Supp.3d 881, 892-893 (S.D.Ohio. 2018)(finding that cross-examination is essential to due process in a case turning on "choice between believing an accuser and accused" and court opined additional protections were due to correct false statement by complainant or provide "the accused with the necessary information to impeach a critical witness.").

[74] *Doe v. Pennsylvania State University*, 336 F.Supp. 3d 441, 449-450 (M.D.Pa. 2018).

[75] *Id.* at 450.

[76] *Johnson v. Temple University--of Commonwealth System of Higher Educ*., 2013 WL 5298484, at 8 (E.D.Pa.,2013)(internal quotations and citations omitted).

provide promised medical records.  Harris closed the investigation and submitted the Packet to OSC because the accuser repeatedly ignored him and the deadline he set for her response had passed.  Notwithstanding this, Penn State permitted Roe to strengthen her allegation and resolve material inconsistencies after the investigation closed.  Harris immediately forwarded the accuser's modifications and explanations to Ms. Feldbaum without, as its policy required, providing Doe with an opportunity to review and respond. Ms. Feldbaum, without explanation, and in contrast to the opportunity afforded Roe, denied Doe's subsequent request to reopen the investigation.

### c.  Penn State Violated the Constitution by Failing to Provide Doe With an Unbiased Tribunal.

"An impartial and unbiased adjudicator is a fundamental part of due process."[77]  In *Withrow v. Larkin*[78], the Supreme Court noted, "various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decision-maker is too high to be constitutionally tolerable." A biased process is not fair; "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities."[79]

---

[77] *Furey v. Temple Univ.*, 884 F.Supp.2d, 223, 255 (E.D.Pa. 2012).
[78] 421 U.S. 35, 47 (1975).
[79] *McClure,* 456 U.S. at 195.

Penn State's policy tasked Mr. Harris with preparing an Investigative Packet that reported on information he deemed relevant and appropriate which he then provided to OSC. Director Feldbaum made decisions regarding credibility and responsibility using "the information in the packet reasonably supports a code of conduct violation" standard.[80] After having made this probable cause-like determination, Feldbaum proposed sanctions.[81] Penn State delegated prosecutorial and adjudicative roles to Feldbaum who presented the University's case to a Panel she selected and oversaw, along with her "pre-hearing" conclusion that the Packet reasonably supported a finding that Doe sexually assaulted Roe along with the all-but-dispositive implication that Roe was credible and Doe was not.

While Doe acknowledges a general administrative proceeding fairness presumption and that Panel prejudice allegations must be " based on more than mere speculation and tenuous inferences."[82] In Doe's case, Penn State undermined the integrity of his process because the (1) Code delegated prosecutorial, adjudicative, and sanctioning roles to the OSC, and (2) the OSC Case Manager's "pre-hearing finding" substantially lessens the Title IX Decision Panel's fact-finding and

---

[80] Although Penn State does not define "reasonably supports", it would be disingenuous for them to dispute that there is very little, if any, distance between this and the Panel's preponderance standard.

[81] Although "reasonably supports" is not defined, it would be disingenuous for PSU to argue that there is any significant difference between this and the Panel's preponderance standard.

[82] *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 15 (1st Cir. 1988*), citing Duke v. North Texas State Univ.*, 469 F.2d 829, 834 (5th Cir. 1972).

adjudicatory autonomy,.[83]   The presumption of guilt embedded in Feldbaum's pre-

hearing determination, in effect, reversed the burden of proof, relegating the Panel

to a role more akin to an appeal tribunal.

> d. **Penn State Violated The Constitution By Using The Lowest Standard Of Evidence In Finding Doe Responsible for A Quasi-Criminal Charge of Sexual Assault**

In the Third Circuit, district courts have given significant weight to the

accused's interests implicated by an adverse finding.[84]  Doe's private interests in this

case are substantial—the right to his continued education at PSU, damaged academic

and professional reputations, and affected ability to enroll at other institutions of

higher education and to pursue a career.[85] This interest has been described by other

---

[83] See *Doe v. Brandeis Univ.*, 177 F.Supp. 3d 561, 606 (D.Mass. 2016)("The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions.").

[84] *E.g.*, *Doe v. Pennsylvania State Univ.*, M.D. Pa. No. 4:18-CV-00164, 2018 U.S. Dist. LEXIS 141423, at 11 (Aug. 21, 2018) (observing that "in addition to a tarnished disciplinary record, he is also facing the stigma of being labeled "responsible" for engaging in nonconsensual sexual intercourse); *Park v. Temple Univ.*, E.D.Pa. No. 16-5025, 2018 U.S. Dist. LEXIS 46765, at 4 (Mar. 20, 2018) ("It is quite obvious that [the student] had an interest in remaining" at the university); *Johnson v. Temple Univ.*, E.D. Pa. No. 12-515, 2013 U.S. Dist. LEXIS 134640, at 22 (Sep. 19, 2013) ("clearly [the student's] private interests are significant").

[85] *See Doe v. Miami University*, 882 F.3d 579, 600 (C.A.6 (Ohio), 2018); The private interest at stake in this case is substantial. "A finding of responsibility for a sexual offense can have a 'lasting impact' on a student's personal life, in addition to his 'educational and employment opportunities,' especially when the disciplinary action involves a long-term suspension." *Univ. of Cincinnati*, 872 F.3d at 400 (quoting *Cummins*, 662 Fed.Appx. at 446); *see also* Ellman–Golan, *Saving Title IX: Designing More Equitable and Efficient Investigation Procedures*, *supra*, at 175 (An individual accused of sexual misconduct "will see his own rights curtailed. He may be forced, even as an interim measure, to move out of university housing or to withdraw from certain classes or to avoid a certain dining hall during certain periods of time. He may be suspended or expelled from school.... And as some states ... begin to pass legislation requiring schools to note on a student's transcript whether the student was suspended or expelled for sexual misconduct, he may face severe restrictions, similar to being put on a sex offender list, that curtail his ability to gain a higher education degree." (internal citations omitted)).

circuits as "compelling" for *Mathews* test purposes. The Sixth Circuit said, "A finding of responsibility will…have a substantial lasting impact on [students'] personal lives, educational and employment opportunities, and reputations in the community.[86] The First Circuit has said, "The interests of students in completing their education, as well as avoiding unfair or mistaken exclusion from the educational environment, and the accompanying stigma are, of course, paramount."[87]

The preponderance of evidence standard, when combined with anemic procedural protections, is simply inadequate in sexual assault disciplinary actions where the consequences are significant and far reaching for wrongfully accused students.[88] Disciplinary proceedings for Title IX sexual assault matters are quasi-criminal with long-lasting impacts for the accused.  Given the significant interests at stake for the accused and the university's interest in "impartially adjudicating quasi criminal sexual misconduct allegations," an elevated standard of proof should apply.[89]

Thus, the effect of a finding of responsibility for sexual misconduct on "a person's good name, reputation, honor, or integrity" is profound. *See Goss v. Lopez*, 419 U.S. 565, 574 (1975).
[86] *Doe v. Cummins*, 662 F.App'x 437, 446 (6th Cir. 2016*, citing Goss*, 419 U.S. at 574-75.
[87] *Gorman*, 837 F.2d at 14.
[88] *E.g., Lee v. the Univ. of New Mexico*, 1:17-cv-01230-JB-LF (D.N.M. Sep. 20, 2018)(concluding that "preponderance of evidence standard is not the proper standard for disciplinary investigations such as the one that led to Lee's expulsion, given the significant consequences of having a permanent notation such as the one UNM placed on Lee's transcript).
[89]*See Plummer v. Univ. of Houston*, 860 F.3d 767, 782-83 (5th Cir. 2017)(Jones, J., dissenting)("Elevating the standard of proof to clear and convincing, a rung below the criminal

III.   <u>Conclusion</u>

For the reasons expressed above, the Defendants' motion to dismiss should be denied.

Respectfully Submitted,

April 5, 2019                                    <u>s/ Andrew Shubin</u>
                                                Andrew Shubin
                                                #63263
                                                Shubin Law
                                                333 South Allen Street
                                                State College, PA 16801
                                                (814) 867-3115
                                                (814) 867-8811 fax
                                                shubin@shubinlaw.com

                                                *Attorney for Plaintiff,*
                                                *John Doe*

---

burden, would maximize the accuracy of factfinding"); *see also Doe v. Univ. of Mississippi*, 3:18-cv-00138-DPJ-FKB (S.D. Miss. 2019).

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the word-count limit set forth in Local Rule 7.8(b)(2) in that it contains 4,788 words, as determined by the word count feature of the word-processing system used to prepare the brief.

Dated: April 5, 2019                                  s/ Andrew Shubin
                                                      Andrew Shubin
                                                      ID #63263
                                                      333 South Allen Street
                                                      State College, PA 16801
                                                      (814) 867-3115
                                                      (814) 867-8811 fax
                                                      shubin@shubinlaw.com

                                                      *Attorney for Plaintiff,*
                                                      *John Doe*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date set forth below, I caused a true and correct copy of the foregoing John Doe's Brief in Opposition to Defendant Penn State's Motion to Dismiss to be served upon the following via the Court's ECF system:

James A. Keller, Esquire
Amy L. Piccola, Esquire
Saul Ewing Arnstein & Lehr LLP
1500 Market Street
Philadelphia, PA 19102
(215) 972-1964
james.keller@saul.com
amy.piccola@saul.com
*Attorneys for Defendants*

Dated: April 5, 2019

s/ Andrew Shubin
Andrew Shubin
ID #63263
333 South Allen Street
State College, PA 16801
(814) 867-3115
(814) 867-8811 fax
shubin@shubinlaw.com

*Attorney for Plaintiff,*
*John Doe*