## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN DOE,

              Plaintiff.

    v.

THE PENNSYLVANIA
STATE UNIVERSITY,

              Defendant.

No. 4:18-CV-02350

(Judge Brann)

## MEMORANDUM OPINION

### MAY 31, 2019

The Pennsylvania State University ("PSU") moved to dismiss John Doe's complaint. That motion will be granted.

### Background[1]

In November 2016, John Doe and Jane Roe[2] were both undergraduate students at The Pennsylvania State University's ("PSU") Altoona campus. On the evening of November 12, 2016, a sexual encounter occurred between the two of them while they were alone in Mr. Doe's bedroom. Although both agree that the encounter

---

[1] All material in this section is taken from Mr. Doe's Complaint (ECF No. 1) and is presumed true.

[2] To protect the students' privacy, Plaintiff is proceeding before this Court under the pseudonym "John Doe," and has referred to his accuser as "Jane Roe." ECF No. 7.

began consensually, Ms. Roe maintains that Mr. Doe eventually exceeded the bounds of that consent.  Mr. Doe denies doing so.

In September 2017, Ms. Roe filed a sexual assault complaint against Mr. Doe with PSU's Office of Student Conduct ("OSC").  The school's Title IX Compliance Specialist, Christopher Harris, was tasked with investigating the incident.

After interviewing Mr. Doe, Ms. Roe, and others, Mr. Harris prepared a draft report of the incident and gave Mr. Doe and Ms. Roe until December 1, 2017, to review and respond to it.  Although Mr. Doe took timely advantage of that opportunity, Ms. Roe did not, despite Mr. Harris's attempts to contact her.

Ms. Roe finally responded to Mr. Harris in January 2018.  Although Mr. Harris had already closed the investigation and forwarded his report to OSC Director Karen Feldbaum, he reopened the investigation and met with Ms. Roe to allow her to explain perceived discrepancies in witness accounts.  After this meeting, Mr. Harris submitted a revised report to Ms. Feldbaum, who in February 2018 decided that the revised report "reasonably supported" the conclusion that Mr. Doe engaged in nonconsensual intercourse.

In March 2018, Mr. Doe asked if the investigation could be reopened to allow him to respond to the information provided by Ms. Roe in January 2018 and included in the revised report.  Ms. Feldbaum denied that request.  Mr. Doe, however, was allowed to file a written response to the charges against him.

In April 2018, a hearing was held on those charges, at which Mr. Doe and Ms. Roe spoke.  The three-person decision-making panel ultimately found Mr. Doe "responsible" for nonconsensual intercourse with Ms. Roe, and suspended him for one year.

Mr. Doe filed this action against PSU in December 2018.  His single-count complaint argues that various aspects of the procedure used by PSU violated his rights under the Due Process Clause.  PSU now moves to dismiss that complaint, arguing that Mr. Doe has failed to state a claim upon which relief can be granted.

## Discussion

### Standard of Review

When considering a motion to dismiss for failure to state a claim upon which relief may be granted,[3] a court assumes the truth of all factual allegations in the plaintiff's complaint and draws all inferences in favor of that party;[4] the court does not, however, assume the truth of any of the complaint's legal conclusions.[5]  If a complaint's factual allegations, so treated, state a claim that is plausible—*i.e.*, if they allow the court to infer the defendant's liability—the motion is denied; if they fail to do so, the motion is granted.

---

[3]   Federal Rule of Civil Procedure 12(b)(6).

[4]   *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3rd Cir. 2008).

[5]   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3rd Cir. 2016).

<u>Cross-Examination and Panel Composition</u>

Mr. Doe argues that PSU violated his Due Process Clause rights by limiting his ability to cross-examine Ms. Roe during the hearing, and by failing to provide an unbiased tribunal for adjudication.  Mr. Doe, however, cannot raise these claims when the hearing notes[6] reflect that Mr. Doe *declined* to pose any questions to Ms. Roe, and *declined* to challenge the panel for bias, despite being given the opportunity to do both of those things.[7]  In other words, Mr. Doe cannot argue that PSU violated his Due Process Clause rights vis-à-vis the cross examination procedure or the panel composition when *no action of PSU* was the cause of any prejudice to Mr. Doe.  And in any event, (1) courts have upheld cross-examination procedures similar to the one offered to Mr. Doe[8] and (2) Mr. Doe's generic allegations that the panel was biased

---

[6]   These notes were attached to Mr. Doe's Complaint, so may be considered at the motion-to-dismiss stage.  *Estate of Roman v. City of Newark*, 914 F.3d 789, 794 (3d Cir. 2019).

[7]   Notes from Mr. Doe's Hearing (ECF No. 9-10) ("Neither the Panel nor [Mr. Doe] had questions for [Ms. Roe.]"); *id.* ("During the opening proceedings, [Mr. Doe] . . . did not challenge any member of the Panel on the basis of bias.").  *See Nash v. Auburn University*, 812 F.2d 655, 664 (11th Cir. 1987) ("[The accused student] w[as] clearly informed when the time came for [him] to ask questions in the prescribed manner.  That [he] did not avail [him]sel[f] of the opportunity to question the witnesses through the chancellor cannot be characterized as a denial of process.").

[8]   According to written procedures, Mr. Doe was permitted to "suggest questions" for Ms. Roe which the panel would "review . . . for relevance and appropriateness before . . . pos[ing] [them] to [her]."  PSU Code of Conduct & Student Conduct Procedures (ECF No. 9-5) at 14.  *See, e.g., Furey v. Temple University*, 884 F. Supp. 2d 223, 252 (E.D. Pa. 2012) (finding due process satisfied where the accused student "was able to cross examine the witnesses by posing questions through the Chair.").

because it was somehow "under [Ms. Feldbaum's] control"[9] is too vague to overcome the "presumption of impartiality in favor of . . . school administrators."[10]

## Participation of Attorney Advisor

Mr. Doe also argues that PSU violated his Due Process Clause rights by denying him "the active and meaningful participation of his attorney advisor."[11] However, other than to suggest that PSU could have allowed his advisor to conduct cross-examination,[12] Mr. Doe does not specify what his advisor should have—but

---

[9]   Mr. Doe argues that Ms. Feldbaum's conclusion regarding Ms. Harris's report (*i.e.*, that the report "reasonably supported" the conclusion that Mr. Doe engaged in nonconsensual intercourse) was an "all-but-dispositive implication that [Ms.] Roe was credible and [Mr.] Doe was not."   Brief in Opposition (ECF No. 23) at 23.   He also argues that Ms. Feldbaum's conclusion "substantially lessen[ed] the Title IX Decision Panel's fact-finding and adjudicatory autonomy" by creating a "presumption of guilt" that, "in effect, reversed the burden of proof."   *Id.* at 23-24.   Without more, these conclusory allegations cannot sustain Mr. Doe's claim, especially since it appears that Ms. Feldbaum did not even attend the hearing.   *See* Notes from Mr. Doe's Hearing (listing everyone "[p]resent in the Title IX review room during the hearing," with no mention of Ms. Feldbaum).

Further, it appears that the review conducted by Ms. Feldbaum was actually intended to *benefit* Mr. Doe (and others in his position), since a contrary finding would have resulted in the immediate termination of the disciplinary proceedings.   PSU Code of Conduct & Student Conduct Procedures at 13 ("If the acquired information does not reasonably support charges, then the case will be closed without charges . . . .").   In fact, Mr. Doe himself analogizes Ms. Feldbaum's finding to a "probable cause-like determination."   Brief in Opposition at 23.   *But see. id.* at 23 n.80 ("Although Penn State does not define 'reasonably supports,' it would be disingenuous for [it] to dispute that there is very little, if any, distance between this [standard] and the Panel's preponderance standard.").

[10]   *Furey v. Temple University*, 884 F. Supp. 2d 223, 256 (E.D. Pa. 2012) ("In disciplinary hearings, there is a presumption of impartiality in favor of the school administrators.   The plaintiff bears the burden of rebutting this presumption with sufficient evidence.   Allegations of prejudice . . . must be based on more than mere speculation and tenuous inferences.").

[11]   Complaint (ECF No. 1) ¶ 85.e.

[12]   Brief in Opposition at 19-20.   This claim fails for the reasons stated above.

was not—permitted to do.  He also does not allege any facts[13] that would take his case outside the normal rule that "at most[,] the student has a right to get the advice of a lawyer" but not the right to have the lawyer "participate in the proceeding in the usual way of trial counsel."[14]

### Adherence to PSU Procedures

Mr. Doe also argues that PSU violated his Due Process Clause rights by failing to follow its own procedures.  In support of this argument, he notes (1) that PSU allowed Ms. Roe to respond to Mr. Harris's report after the December 1, 2017 deadline had passed; (2) that Mr. Harris modified his report because of Ms. Roe's feedback; and (3) that PSU denied Mr. Doe's request to reopen the investigation to allow him to respond to Mr. Harris's revised report.

PSU's "Title IX Report Procedures"[15] indicate the following:

> Formal Investigations will be conducted by trained investigators designated by the Title IX Coordinator.  When a formal investigation process is initiated, the assigned investigator will attempt to gather whatever relevant information may be reasonably available regarding the alleged incident.  This may include interviewing the Complainant,

---

[13]  *Furey*, 884 F. Supp. 2d at 252 ("Several courts have held that a student is entitled to have legal counsel in a disciplinary hearing when the student is *also facing criminal sanctions* for the same underlying conduct.") (emphasis added); *id.* at 252 n.35 ("Courts have also speculated that due process could require active representation by counsel *when the school's case is presented by an attorney or the procedures are unusually complex*.") (emphasis added).

[14]  *Johnson v. Temple University*, Civil Action No. 12-515, 2013 WL 5298484, at *10 (E.D. Pa. Sept. 19, 2013).

[15]  http://titleix.psu.edu/psu-title-ix-procedures; *see* PSU Code of Conduct & Student Conduct Procedures at 13 (noting that PSU "will typically investigate [sexual misconduct] allegations utilizing the process articulated at http://titleix.psu.edu").

Respondent, and/or any other witnesses who are identified during the course of the investigation, as well as gathering available documentary, electronic, or physical evidence. Parties will be provided with adequate notice of the investigation and a meaningful opportunity to be heard.

At the conclusion of the investigation, the assigned investigator will prepare a draft Investigative Packet, which will contain all material information gathered during the investigation and being put forward for consideration in determining whether to hold the Respondent responsible for the alleged incident. The draft Investigative Packet will not contain any findings of responsibility/non-responsibility. The assigned investigator will complete his or her investigation, in a timely manner.

The Complainant and Respondent will be provided with an opportunity to meet with the assigned investigator in order to review the draft Investigative Packet, submit additional information or comments, identify additional witnesses or evidence for the investigator to pursue, and submit any additional questions that they believe should be asked of any other party or witness. The parties will have up to 5 business days to submit any additional questions or follow-up after reviewing the draft Investigative Packet.

Once the parties have responded to the draft Investigative Packet or the 5 business days have elapsed, the assigned investigator will review and address any questions or follow-up submitted by the parties in response to the draft Investigative Packet, as appropriate. This may include conducting additional investigation. The assigned investigator will then incorporate any revisions or new information into a final Investigative Packet within 5 business days, if possible. The parties will be provided with an opportunity to review any new information that is added to the Investigative Packet before it is finalized.

The final Investigative Packet will be forwarded to a Case Manager in the Office of Student Conduct. The assigned investigator will not include a recommended finding of responsibility in the final Investigative Packet.

On their face, these procedures (1) provide no deadline by which either Mr. Doe or

Ms. Roe had to review the draft report (though the procedures indicate that responses

to that report are due within 5 days of review);[16] (2) allowed Mr. Harris to revise his report after meeting with Ms. Roe; and (3) do not indicate that either party should have been given more than one opportunity to respond to the report.  And despite Mr. Doe's contentions,[17] he was in fact provided the opportunity to review the new information in the revised report before it was sent to Ms. Feldbaum.[18]

If Mr. Doe is arguing that due process *required* PSU to allow him to respond to the revised report, that argument fails.  After all, he was permitted (1) to review the revised report with Ms. Feldbaum; (2) to submit a written response to that revised report and charges; and (3) to appear and speak before the panel at his hearing.  And he alleges no facts showing that the panel prevented him from presenting any important testimony or other evidence because, *e.g.*, it was outside the scope of Mr. Harris's report.[19]

---

[16] To the extent Mr. Doe bases his claim on the fact that Ms. Roe was given *more time* to review the report—*i.e.*, that Ms. Roe was not forced to comply with the December 1, 2017 deadline—he also fails to explain, or allege any facts showing, how this prejudiced him in any way.

[17] Brief in Opposition at 22 ("[Mr.] Harris immediately forwarded [Ms. Roe's] modifications and explanations to Ms. Feldbaum without . . . providing [Mr.] Doe an opportunity to *review* and respond.") (emphasis added).

[18] January 19, 2018 Email from Mr. Harris to Mr. Doe (ECF No. 9-8) ("I met with [Ms. Roe] today, and I asked her a couple of follow-up questions that I planned to ask her if we'd met at an earlier date.  I've attached a document with two additions that were made to the report based on my conversation with [her] . . . .  I will submit a revised draft of the report to [Ms. Feldbaum] today.").

[19] Mr. Doe alleges that "the Code limited him to 'highlighting' portions of the packet" during his panel appearance, Complaint ¶ 65, but does not indicate if there was other evidence he wanted to present, the exclusion of which might have risen to the level of a Due Process Clause violation.  *See* PSU Code of Conduct & Student Conduct Procedures at 14 ("When the hearing convenes, no new information may be provided to the hearing authority, unless the person

## Preponderance of the Evidence Standard

Mr. Doe also argues that PSU violated his Due Process Clause rights by requiring the hearing panel to determine his guilt using the preponderance of the evidence standard.

As this Court has noted in a similar case:

> When deciding "what process is due" in student disciplinary proceedings, courts . . . consider[] (1) the students' "private interest[s] that will be affected by the official action"; (2) the schools' interest, "including the function involved and fiscal and administrative burdens that the additional or substitute procedural requirement would entail"; and (3) the accuracy of existing procedures and "the probable value, if any, of additional or substitute procedural safeguards."
>
> [The accused student's] private interests are his continued education at PSU as well as his reputation. The Supreme Court has already noted that a ten-day suspension is "a serious event"; [a] year-long suspension, therefore, is correspondingly more grievous. And the potential damage to [the student's] reputation is at least equally weighty, if not more so—after all, in addition to a tarnished disciplinary record, he is also facing the stigma of being labeled "responsible" for engaging in nonconsensual sexual intercourse.
>
> PSU, on the other hand, seeks to maintain a safe environment for its students—with an emphasis on the word "students." PSU's mission, after all, is foundationally educational. Although PSU has an interest in maintaining discipline and order on its campuses, that interest is a means to its ultimately pedagogic end, and every dollar spent regulating and investigating its students' behavior is a dollar not spent on teaching, learning, or scholarship.

---

offering the information can show that the evidence was (1) not available during the investigation, and (2) is relevant to establishing whether or not the Respondent is responsible for misconduct.").

Complimenting this interest in discipline, however, is PSU's interest in securing accurate resolutions of student complaints like the one at issue here. PSU's educational mission is, of course, frustrated if it allows dangerous students to remain on its campuses. Its mission is equally stymied, however, if PSU ejects innocent students who would otherwise benefit from, and contribute to, its academic environment.[20]

Mr. Doe suggests that the burden of proof should be raised to the clear and convincing evidence standard.  It cannot be denied that such a change—though perhaps virtually costless from a financial perspective—would harm the proceeding's accuracy, because it would statistically result in more actually guilty individuals being found "not responsible."  While some may argue that such a result is acceptable in light of the enormous interests at stake,[21] this Court must uphold the principles of federalism embedded in our founding document and must remain "mindful of [the Supreme Court's] admonition [that] [j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint."[22]  In short, it is not this Court's job to judge the wisdom of PSU's disciplinary procedures, but instead to ask whether those procedures deserve a blow from the heavy hammer of the United States Constitution.

---

[20]   *Doe v. Pennsylvania State University*, 336 F. Supp. 3d 441, 446-47 (M.D. Pa. 2018).

[21]   *Cf. In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring) ("[T]he requirement of proof beyond a reasonable doubt in a criminal case [is] bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.").

[22]   *Goss v. Lopez*, 419 U.S. 565, 578 (1975).

Courts have split on this issue.[23]  However, in light of the other procedural protections in place—Mr. Doe's ability to address the panel personally; the (declined) opportunity to pose questions to Ms. Roe; the use of a multi-member panel; the presence of his attorney advisor—this Court cannot say that, by itself, PSU's use of the preponderance of the evidence standard violates the Due Process Clause of the United States Constitution, especially since Mr. Doe has been unable to successfully point out any other problematic aspects[24] of the process used to adjudicate his case.[25]

## Conclusion

Mr. Doe has failed to support his Due Process Clause claim.  His arguments— regarding (1) his opportunity to cross-examine Ms. Roe; (2) the bias of the hearing

---

[23]   *Compare Doe v. Cummins*, 662 Fed. Appx. 437, 449 (6th Cir. 2016) (noting that a school's use of the preponderance of the evidence standard, "in addition to having other procedural mechanisms in place that counterbalance the lower standard used . . . does not give rise to a due-process violation") *with Doe v. University of Colorado*, 255 F. Supp. 3d 1064, 1082 n.13 (D. Colo. 2017) ("[T]here is a fair question whether preponderance of the evidence is the proper standard for disciplinary investigations such as the one that led to Plaintiff's expulsion.").

[24]   In his Brief in Opposition, Mr. Doe argues that PSU violated his Due Process Clause rights by "failing to limit [Mr. Harris's] power to funnel and filter evidence, including exculpatory evidence, related to the accusation.").  Brief in Opposition at 20-21.  This claim, however, does not appear in his Complaint, so it will not be considered.  *See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

[25]   *Cf. Plummer v. University of Houston*, 860 F.3d 767, 782 (5th Cir. 2017) (Jones, J., dissenting) ("[T]he process deployed against the students [accused of sexual misconduct] was fundamentally flawed because of . . . the preponderance standard for adjudicating quasi criminal conduct . . . *compounded by* [other problems].") (emphasis added).

panel; (3) the participation of his attorney advisor; (4) PSU's adherence to its own procedures; and (5) PSU's use of the preponderance standard—have all been rejected.  This Court, therefore, will grant PSU's motion and dismiss his Complaint for failure to state a claim upon which relief can be granted.

The Court, however, will allow Mr. Doe to file an amended complaint to allege facts that may sustain any of the claims made in his current complaint or to raise claims challenging other part of PSU's adjudication procedure which, on their own or when combined with PSU's use of the preponderance of the evidence standard, may rise to the level of a constitutional violation.  An appropriate order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge